FEDERMAN & SHERWOOD
William B. Federman (OK #2853)
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

Marc S. Henzel, Esq.,
Law Offices of Marc Henzel
273 Montgomery Ave., Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

Kenneth L. Pedersen (ISB #1436)
klpedersen@pedersen-law.com
Jarom A. Whitehead (ISB #6656)
jwhitehead@pedersen-law.com
PEDERSEN and WHITEHEAD
161 5th Ave. S., Ste. 301
P. O. Box 2349
Twin Falls, ID 83303-2349
Telephone: (208) 734-2552
Facsimile: (208) 734-2772
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SANJAY ISRANI, derivatively on behalf of Nominal Defendant NightHawk Radiology Holdings, Inc., <br><br> Plaintiff, <br><br> v. <br><br> PAUL E. BERGER. JAN D. BERGER, TIMOTHY M. MAYLEBEN, GLENN R. COLE, CHARLES R. BLAND, DAVID J. BROPHY, and PETER Y. CHUNG, <br><br> Defendants, | Case No. _____ |

1

And                                     )
                                        )
NIGHTHAWK RADIOLOGY                     )
HOLDINGS, INC.,                         )
                                        )
                Nominal Defendant.      )

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Sanjay Israni, by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant NightHawk Radiology Holdings, Inc. ("NightHawk" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from May 2, 2007 to the present (the "Relevant Period").

## I.      JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

4.      Venue is proper in this district because a substantial portion of transactions and wrongs complained of herein occurred in this district. Defendants either reside in or maintain executive offices or participated in board meetings in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business here.

## II.     PARTIES

5.      Plaintiff Sanjay Israni is a citizen of the State of New Jersey.  He is an owner and holder of NightHawk common stock and has continuously held NightHawk common stock throughout the Relevant Period.

6.      Nominal Defendant NightHawk Radiology Holdings, Inc. is incorporated in Delaware and maintains its headquarters at 601 Front Avenue, Suite 502, Coeur d'Alene, ID 83814. NightHawk, through its subsidiaries, provides professional services, business services, and clinical workflow technology to radiology groups and hospitals in the United States.

7.      Defendant Paul E. Berger ("Paul Berger") is a citizen of the State of Idaho. He served as NightHawk's President, Chief Executive Officer and Chairman of the Board from 2004 to July 25, 2007. Prior to that, he was the President and Chairman of NightHawk's predecessor. From July 25, 2007 until November 15, 2008, Paul Berger served as NightHawk's CEO and Chairman. On November 15, 2008, he resigned as CEO, but remained on the Board until June 8, 2009. In connection with Paul Berger's resignation and replacement as CEO, NightHawk agreed to purchase 3,000,000 shares of his NightHawk stock at a price of $559,331, thereby removing him as a substantial shareholder of NightHawk.   Under the Transition and Separation Agreement, dated as of November 14, 2008, Paul Berger also received: 1) an aggregate amount equal to $600,000, payable in 12 monthly installments; 2) accelerated vesting of restricted stock units granted on February 19, 2008; 3) health benefits under the Company's health plan; and 4) reimbursement of certain legal expenses.

8.      Defendant Jon D. Berger ("Jon Berger") is a citizen of the State of Idaho. He served as NightHawk's Vice President of Sales, Marketing and Business

3

Development and as a Director from 2004 until 2008. On or about February 13, 2008, Jon Berger assumed the role of Senior Vice President of Strategy and Business Development and served briefly as interim Chief Operating Officer ("COO"). On November 15, 2008, Jon Berger resigned as a NightHawk Director and as Senior Vice President of Strategy and Business Development. NightHawk purchased substantially all of Jon Berger's NightHawk shares in 2009 valued at $74,525, to remove him as a substantial shareholder.   Under the Transition and Separation Agreement, dated as of November 14, 2008, Jon Berger also received: 1) a lump sum payment in an aggregate amount equal to $397,000; 2) accelerated vesting of restricted stock units granted on February 19, 2008; and 3) health benefits under the Company's health plan.

9.     Defendant Timothy M. Mayleben ("Mayleben") is a citizen of the State of Idaho.  He served as NightHawk's Executive Vice President and COO from January 8, 2007 to July 25, 2007. On July 25, 2007, Mayleben was appointed as President to succeed Paul Berger. Mayleben continued in the role of NightHawk's President and COO until February 29, 2008. Mayleben also served on NightHawk's Board from March 2005 until his resignation on February 19, 2008. Mayleben announced his resignation as NightHawk's President, COO and Director on February 13, 2008.

10.     Defendant Glenn R. Cole ("Cole") is a citizen of the State of Idaho.  He served as NightHawk's Senior Vice President and Chief Financial Officer ("CFO") from May 1, 2007 until May 14, 2008.  Cole announced his resignation from his position as NightHawk's Senior Vice President and CFO on February 13, 2008.

4

11.    Defendant Charles R. Bland ("Bland") is a citizen of the State of North Carolina.  He has served as a member of NightHawk's Board of Directors from April 2007 to the present.

12.    Defendant David J. Brophy ("Brophy") is a citizen of the State of Michigan. He has served as a member of NightHawk's Board of Directors from 2004 to the present.

13.    Defendant Peter Y. Chung ("Chung") is a citizen of the State of California. He has served as a member of NightHawk's Board of Directors from April 2004 to the present.

14.    The Defendants outlined in paragraphs 7-13 are hereinafter referred to collectively as "Individual Defendants."

## III.    INDIVIDUAL DEFENDANTS' DUTIES

15.    By reason of their positions as officers, directors, and/or fiduciaries of NightHawk and because of their ability to control the business and corporate affairs of NightHawk, Individual Defendants owed NightHawk and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage NightHawk in a fair, just, honest, and equitable manner.  Individual Defendants were and are required to act in furtherance of the best interests of NightHawk and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to NightHawk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the

use and preservation of its property and assets, and the highest obligations of fair dealing.

16.    Individual Defendants, because of their positions of control and authority as directors and/or officers of NightHawk, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with NightHawk, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

17.    To discharge their duties, the officers and directors of NightHawk were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of NightHawk were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

    d. Exercise good faith by ensuring that the Company's representatives are completely truthful and honest and refrain from concealing and misrepresenting facts and refrain from engaging in dishonest, deceitful and misleading statements and conduct in their communications with and statements to governmental authorities, shareholders, customers, potential

customers, representatives of the media and the general public about its business affairs.

**IV.   SUBSTANTIVE ALLEGATIONS**

18.    In 2001, Defendants Paul Berger, and his son, Jon Berger, co-founded NightHawk to provide off-hour preliminary reads to radiology groups and U.S. hospitals via the practice of teleradiology. Hospitals would take a medical scan, such as CT scans and X-rays, and NightHawk would electronicially transmit the scan to an offsite location to be read and interpreted by a radiologist. The reading radiologist would then electronically transmits the report back to the physicians.

19.    At its inception and until 2007, NightHawk retained, on a contract basis, radiologists in Switzerland and Australia, working during their daylight hours, to quickly furnish preliminary "reads" or informal reports for immediate treatment decisions at hospitals during off-hours in the United States. These reports were considered "preliminary," in part, because Medicare and certain other insurance plans did not provide reimbursement for radiology reports performed in foreign countries by foreign doctors.

20.    U.S. radiology groups contracted with and paid NightHawk for its "preliminary" reads, which were to be followed by "final" reads and reports prepared by the U.S. radiology groups. Thus, U.S radiologists did not need to be on call during evening and weekend hours, and they could prepare the "final" read during daylight hours and apply for reimbursement from Medicare or other insurers.

21.    From its inception until early 2007, NightHawk provided off-hour preliminary reads exclusively from its centralized reading facilities located in Australia and Switzerland. The foreign radiologists were retained as "independent contractors",

but they still had to be licensed in the various states where the hospitals were located, and credentialed by the individual hospitals receiving the preliminary reads. A critical aspect of NightHawk's business was to facilitate the licensing and credentialing of its foreign radiologist contractors to permit them to practice at the hundreds of U. S. hospitals that NightHawk serviced.

22.     To run its business, NightHawk used several computer systems -- the Falcon, AutoRad and TALON systems. These systems: 1) facilitated the transmittal of the medical scans and reports; 2) tracked information about NightHawk's radiologist customers and hospital sites; and 3) kept track of the number of customers and sites that NightHawk had for reporting to the public.  The Falcon system was especially important, as it tracked its radiologists' licenses, credentials and privileges and conducted scheduling to ensure that a customer was properly matched with a radiologist who was properly licensed and privileged.

23.     In 2007, NightHawk engaged in a series of corporate acquisitions in order to obtain access to U.S.-based radiologists who could perform "final" reads and reports (and be directly reimbursed by Medicare and the insurers) and to expand its customer base. Through these acquisitions, NightHawk also planned to market the newly acquired U.S.-based radiologists "final" read services to its existing hospital customers, and to broaden the suite of administrative services it could "cross-sell" to its radiologist group customers. However, NightHawk was unable to effectively integrate the companies.   Because of this setback, the new U.S.-based radiologists rejected NightHawk's lower compensation model, NightHawk's services – both for preliminary

reads and final reads – deteriorated, and its customers cancelled or refused to renew their contracts.

24.    Nonetheless, Defendants issued glowing reports about the acquisitions on which they had squandered more than $150 million in corporate assets, and continued to tout their purportedly high customer retention rates and successful inroads into the final reads business.

### A.    The Fraudulent Scheme

25.    From its first full year of operations in 2002, which saw annual revenue of $4.7 million, NightHawk's business of providing off-hour preliminary reads to radiology groups and hospitals grew rapidly. NightHawk's annual revenue for 2003, 2004, and 2005 was $16.2 million, $39.3 million, and $64.1 million, respectively.   In February 2006, NightHawk went public at $16 per share.

26.    For 2006, NightHawk's annual revenue had increased to $92.2 million – 44% growth over the prior year – and, in the Company's 2006 annual report, NightHawk proclaimed itself to be "the leading provider of radiology services to radiology groups and hospitals across the United States."

27.    Up through 2006, virtually all of NightHawk's revenue was derived from its contracts to supply preliminary reads to the emergency rooms of U.S. hospitals. Hospitals and radiology groups reached out to NightHawk for its unique and valued service. But NightHawk began to experience competition for its off-hour preliminary reads business, and its fourth quarter 2006 ("4Q06") earnings showed that the average price for off-hour preliminary reads had declined 260 basis points (2.6%) during 2006.

To sustain growth, NightHawk recognized that it needed to branch out into new service areas.

28.    In 2007, NightHawk followed an aggressive corporate acquisition strategy in order to "cross-sell" a more comprehensive package of services to its U.S. radiology groups.    Through these acquisitions, the Defendants planned to: 1) increase NightHawk's customer base; 2) obtain access to additional U.S. radiologist contractors in order to gain entry into the much larger traditional market for "final" radiology reads; 3) market the software developed by Paul Berger's other son, Scott Berger; and 4) acquire an administrative services group. This strategy involved a series of three key corporate acquisitions, all made at prices far exceeding the value of their tangible and measurable assets: the acquisition of Teleradiology Diagnostic Service in February 2007; Radlinx in April 2007; and Midwest Physician Services LLC in July 2007.   The Board knew of and participated in the acquisitions.

29.    NightHawk spent millions of dollars in cash and loans to financing these business with largely "intangible" property rights such as customer lists and contracts, their professional fee contracts with U.S. radiologists performing the preliminary and final reads, and a suite of administrative services that Defendants hoped to cross-sell to the Company's existing radiologist group customers.

30.    However, the hoped-for "cross-selling" opportunities, as the Board knew, were not realized, and that the extraordinary burdens of integrating the new acquisitions caused the loss of NightHawk's existing and newly acquired customers. In addition, Radlinx's lower-priced customer contracts, and its higher-priced professional services agreements, were devastating the Company's profit margins. Finally, no one wanted to

purchase the highly touted TALON business software application developed by Paul Berger's second son, Scott Berger – including St. Paul Radiology which was now committed by NightHawk to using it – because it was poorly designed.

**B.     The Acquisition of Teleradiology Diagnostic Service**

31.     On February 9, 2007, NightHawk acquired Teleradiology Diagnostic Service, Inc. ("TDS"), a privately-held, California-based provider of off-hours teleradiology services, for $23 million in cash. NightHawk described TDS as "a leading provider of off-hours teleradiology services on the West Coast, providing services to hospitals throughout California, the largest market in the U.S." The purchase of TDS expanded NightHawk's presence in California and provided NightHawk with U.S.-based radiologists to perform both preliminary and final reads. According to statements made by Defendants at the May 2, 2007 earnings conference call, the TDS acquisition resulted in the addition of "32 customers serving 59 sites," and 12 additional radiologist contractors performing the reads.

32.     During NightHawk's February 15, 2007 earnings conference call, Paul Berger explained that the $23 million purchase price was based upon "TDS' strong profitability and expectations for continued strong performance in 2007 and beyond." NightHawk's Quarterly Report (Form 10-Q) for the period ended March 31, 2007, reflected an allocation of the purchase price showing that virtually all of the $23 million, plus $6 million of assumed liabilities, were paid for the intangible rights and benefits (*i.e.*, goodwill) NightHawk was acquiring:

33.     For the purchased $28 million of intangible assets and goodwill to have any value, Defendants needed to retain TDS's customers and radiologist contractors

11

and build upon this base. Most of these contracts could be cancelled, without fault, on 30-60 days written notice, so that the benefits of this purchase would be lost if TDS could not be quickly and effectively integrated into NightHawk's existing business operations.

34.    TDS provided off-hour services only to hospitals in California. In order for TDS's radiologists to be integrated into NightHawk, they needed to be able to read scans from NightHawk's  other U.S. customers. This meant they needed to be licensed and privileged at hundreds of hospitals located throughout the country.

35.    Similarly, in order to integrate TDS's hospital customers into the NightHawk system, the foreign-based radiologists needed to be licensed in California and the hospitals needed to review their backgrounds and grant them treatment privileges.

36.    Many new customers did not want to undertake the burden of privileging the additional radiologists. NightHawk also charged more for its teleradiology services than its acquired companies. As a result, NightHawk soon discovered that it was unable to keep the TDS customers from cancelling their contracts or to effectively use the newly acquired radiologists.

C.    **The Acquisition of The Radlinx Group**

37.    On April 9, 2007, NightHawk acquired The Radlinx Group ("Radlinx") for $53 million in cash plus a future earnout based upon 25% of Radlinx customers' first year revenues following the acquisition. NightHawk described Radlinx as the third largest provider of teleradiology services in the United States. In NightHawk's April 9, 2007 press release announcing the deal, Paul Berger explained the benefits NightHawk

anticipated from acquiring Radlinx's U.S.-based radiologists who, as a legal matter, were permitted to perform and receive reimbursement for final reads, as well as preliminary reads:

> The Radlinx Group is an excellent addition to the current NightHawk suite of radiology solutions . . . . **The acquisition significantly expands our core off-hours business, strengthens our partnerships with radiology groups to help grow our final interpretation and subspecialty business, and extends our capability of providing radiology solutions and improving patient care with such a strong presence of doctors located domestically.**

> [Emphasis added.]

Paul Berger was also quoted as asserting that the Company's capability to perform "final" reads and provide new services had been expanded by the TDS and Radlinx acquisitions:

> In addition to our core off-hours business continuing to demonstrate solid growth, **we expanded further into new areas during the quarter by expanding our daytime reads capacity as well as our service offerings in the cardiac imaging and final reads markets. We also acquired Teleradiology Diagnostic Service, Inc. (TDS) during the quarter and recently announced the acquisition of The Radlinx Group. Both companies are leading providers of off-hours and daytime teleradiology services in the U.S. and enhance our value proposition to offer a full suite of services to our customers.**

> [Emphasis added.]

38.    On June 6, 2007, NightHawk filed an Amended Current Report (Form 8-K/A) in which it provided Radlinx's pre-acquisition financial statements. Radlinx's balance sheet revealed total liabilities of $17.9 million, nearly $13 million more than its hard assets of only $4.4 million – *i.e.*, at the time of its acquisition, Radlinx was seriously insolvent. Radlinx's income statement for 2006 disclosed only modest operating income of $2.75 million in light of its $53 million plus purchase price, high liabilities and its minimal concrete assets. For its purchase of Radlinx, NightHawk attributed over $36

million of the purchase price to goodwill and $19.4 million to other intangible assets. Again, like TDS, virtually all of the corporate acquisition was attributed to intangible rights and benefits that depended upon NightHawk's ability to retain Radlinx's customers and radiologist contractors.

39.    According to statements made at the Company's July 25, 2007 earnings call, NightHawk acquired 188 radiologist group customers (i.e. doctors) serving 307 hospital sites. At the time of the acquisition, Radlinx also purportedly had 41 U.S.-based radiologists on retainer. Defendants emphasized that, with these additional U.S.–based radiologists, the acquisition gave NightHawk further access to the all important "final" reads market.

40.    The Radlinx acquisition would later be revealed as an unmitigated disaster. First, the U.S.-based radiologists retained by Radlinx were paid far more than NightHawk's foreign radiologists, and as Defendants would later reveal, only about half of the Radlinx doctors agreed to work for NightHawk. Even those who did commit to work for NightHawk were paid at a significantly higher rate, which drove down the Company's operating margins. Because of the radiologist shortage and NightHawk's poor scheduling practices, coverage gaps occurred at the newly acquired hospital customers, resulting in customer cancellations of and refusals to renew their contracts. To limit these cancellations and the further deterioration of services, the Radlinx radiologists were paid additional "bonuses," which further undercut NightHawk's margins. Furthermore, neither the Radlinx nor TDS acquisition resulted in meaningful "final" read or business services volumes or profits.

14

41.    In addition to suffering coverage gaps from NightHawk, many legacy Radlinx customers, just like TDS customers, were dissatisfied with having to privilege 25 to 40 radiologists when Radlinx had provided them with coverage with only five or six radiologists. The added costs associated with privileging so many NightHawk radiologists to obtain proper coverage further led customers to cancel their contracts with NightHawk.

42.    Finally, NightHawk charged more for its services than had Radlinx. When NightHawk tried to impose its higher prices upon Radlinx customers, Radlinx customers refused, especially given the deterioration in service and coverage they were receiving. With ample lower cost competitors providing an alternative to NightHawk, legacy Radlinx customers either cancelled their contracts under the 30-day written notice provision or declined to renew their contracts with NightHawk. The end result was additional lost customers.

**D.    The Acquisition of Midwest Physician Services, LLC**

43.    On July 16, 2007, NightHawk acquired Midwest Physician Services, LLC ("Midwest") from St. Paul Radiology ("St. Paul"), for $62.5 million plus a warrant entitling St. Paul to purchase 300,000 shares of NightHawk common stock. By this acquisition, NightHawk also acquired Emergency Radiology Services, LLC, St. Paul's small teleradiology group. As part of the same transaction, St. Paul, itself a large radiologist group serving over 40 hospitals, agreed to a multi-year business services contract with Midwest, for a percentage of St. Paul's on-going revenues. Through this agreement, St. Paul also agreed to use the TALON software developed by Paul Berger's son, Scott Berger.

44.     Before the acquisition, Midwest, with about 100 employees, had provided St. Paul – its only customer – with administrative support, including revenue cycle management, human resources management, transcription, and other services required to effectively operate a radiology practice. As NightHawk declared in its press release dated July 16, 2007 announcing the acquisition, "[t]he combination of these business services with NightHawk's professional services and clinical workflow technology will provide a powerful competitive advantage for NightHawk." NightHawk renamed Midwest "NightHawk Business Services" and, according to Mayleben, planned to "cross-sell" these business services to NightHawk's "over 700 radiology group customer base." Throughout the Relevant Period, that never happened; St. Paul remained the only user of Midwest's business services.

45.     As described above, at the time of its acquisition, Midwest had exactly one customer – St. Paul. As part of the acquisition, St. Paul and NightHawk entered into a long-term agreement under which NightHawk would provide business services, including the use of NightHawk's TALON clinical workflow technology, to St. Paul in exchange for "a fee based on a percentage of St. Paul Radiology's revenue." NightHawk estimated that for 2007, Midwest would contribute $8 to 9 million in revenue and $16 to 18 million in revenue for 2008.

46.     The Midwest acquisition revealed, however, that NightHawk's highly touted TALON system – developed by Paul Berger's son, Scott Berger – simply did not work. Instead, problems with TALON would lead St. Paul to declare NightHawk in material breach of its services agreement, leading to the eventual unwinding of the Midwest / St. Paul transaction at a significant loss to NightHawk. Moreover, NightHawk

has never succeeded in marketing Midwest's business services to any of its other customers.

47.   The purchase of Radlinx and Midwest was financed with a $150 million loan carrying an interest rate of 250 basis points over LIBOR, or in 2007, about a 7.5% interest rate. The bulk of the acquired Radlinx and Midwest intangible property – more than $46 million of goodwill – has been written off as impaired.

### E.   The Impact of NightHawk's Acquisitions

48.   In a February 13, 2008 press release, NightHawk announced that Mayleben would be leaving the Company and that Cole would be stepping down from the Company in the following quarter, which aroused suspicion that the Company was experiencing serious problems.

49.   On February 13, 2008, following the issuance of the press release, NightHawk held an earnings conference call with analysts and investors to discuss NightHawk's earnings and operations.

50.   In response to questions concerning NightHawk's revisions to its 2008 guidance, Cole grudgingly revealed that, to date, the Company had not succeeded in breaking into the final reads market or in cross-selling Midwest's business services:

> Yes, David, and I'll let Dr. Berger comment on this as well for some color. But clearly *I think the number one factor is simply our continued evolution into this finals market.* Huge opportunity as we've discussed on numerous occasions, but it is also – it is probably the single largest factor that could sway us one direction or the other in terms of the range within that guidance. And that would be number one by a long shot.
>
> Beyond that going down the list, Midwest Physicians, we've guided I would say very conservatively on it. It's essentially just in fact it's a little less than a doubling of our actual results for this year and next year. And we've done that consciously to be very conservative in that the – *for instance right now, our only customer, St. Paul Radiology, from the business services perspective* we want to make sure we don't get

ahead of ourselves where there could be some weakness if indeed any of the issues regarding DRA or something take impact there.

As you know, we actually receive revenue as a percentage of St. Paul's total revenue. And as I think was mentioned earlier, we don't want to get too far out in front of ourselves in terms of projecting growth into our new customer base in 2008 on that. But there is a great opportunity there.

The CCTA stuff, for sure we've been very, very careful not to want to put ourselves in the sort of position we were in in 2007 and rely on anything here significant. As you know, the flood gates could open there and we don't want to guide though based on possible floodgates opening. So we are essentially projecting very, very modest increases in that area.

But going back to your question, *I think the gist of it is certainly finals and our ability to execute from a sales perspective into that finals market would be our primary number one factor.* And Dr. Berger, you may want to comment for some additional color here.

[Emphasis added.]

51.   Paul Berger then threw the assembled analysts off the track by asserting that the changes in guidance were attributable to a newfound conservatism in preparing estimates, and possibility of a future industry-wide downturn, rather than the existing degradation in the Company's actual business performance:

> *The conservatism in our guidance is related to the fact that we've just decided to assume a more conservative approach to things because of this experience at this point in time. Silly things even enter our – or maybe not so silly things enter our mind when people raise the issue where the spectrum of a recession or some type of economic downturn.* And what happened to the healthcare industry or new industry like ours if there was some economic downturn. *My honest opinion is it will have very little impact. But again, when one assumes a conservative position, it's imperative that we take these things into consideration.* [Emphasis added.]

52.   Paul Berger then evaded an analyst's direct question on customer retention, a metric that Defendants had, in the past, repeatedly touted as a key indicator of the Company's success:

Yes, again, when we talk about retention, David, we really are looking at volumes. It's all about volumes and the price we get for the amount of examinations we do and we had a 93% retention in volumes in this year which we think is in a competitive market quite successful.

Paul Berger's response prompted a follow up question: "Do [you] have a sense where that ended the year? Was fourth quarter better or worse than say the prior quarters?" To which Paul Berger replied, "*I honestly don't know, I don't know.*" Given the centrality of customer retention and the trend in revenues from quarter to quarter, it may be strongly inferred that, in fact, Paul Berger was not answering "honestly." Moreover, others on the call, including his son, Jon Berger, who directly received the cancellation notices from customers, were well aware of the deterioration in customer retention and the deteriorating sequential revenue growth trends, but failed to correct Paul Berger's sunny assurances, and to reveal that the 2008 guidance was known to be baseless because it conflicted with current, undisclosed facts. [Emphasis added.]

53.      By a press release dated May 7, 2008, NightHawk announced its financial results for the first quarter of 2008 ("1Q08"), the period ended March 31, 2008. For the quarter, NightHawk reported sharply lower revenues and income. It also sharply reduced its 2008 revenue and adjusted earnings guidance, admitting, for the first time, that recurring operational problems had reduced the Company's profitability:

**Outlook**

*"After identifying our challenges on both the sales and cost fronts, and the need to improve our processes in those areas, we are revising our full-year 2008 guidance.* As we continue into 2008, we will strive to improve our operations in these areas of the business while also capitalizing on continued growth in the industry as well as our position as the industry's leading provider of radiology solutions." The company estimates that 2008 revenue will be in the range of $171-$181 million and estimates that 2008 adjusted earnings per diluted share (excluding noncash stock compensation, IBNR and amortization of intangibles, tax effected) will be in the range of $0.70-$0.82.

[Emphasis added.]

54.     On May 7, 2008, NightHawk held an earnings conference call with analysts and investors to discuss NightHawk's earnings and operations. Paul Berger participated in the conference call along with Tim Murnane, who had replaced Mayleben as NightHawk's President and COO, where they revealed that NightHawk's problems were not only operational and recurring, but that they dated back to earlier quarters, when the Individual Defendants had made their rosy assurances, and omitted key facts. As Paul Berger stated:

> **What have been the fundamental problems? First is a failure of our sales operations and execution during the last two quarters.** Primarily related to this, we are revising our revenue guidance down for 2008 to $171 million to $181 million. Tim will discuss this in more detail momentarily.
>
> **Secondly, during the last year, we ramped up our infrastructure which resulted in increased costs and SG&A to support a larger company.** We also had some additional unanticipated professional services expense related to physician scheduling challenges during the quarter. The net result was higher professional service expense, higher SG&A, and lower earnings.
>
> As a result of this and the revenues we talked about, we are now lowering adjusted earnings per share to be in the range of $0.70 to $0.82. More details will follow on this as well. [Emphasis added.]

55.     Following up on Paul Berger's comments, Tim Murnane explained that when he and NightHawk's new sales head came on board, they learned that the Company's projected 2008 sales revenues conflicted with reality: "**Among our first tasks was taking a very detailed look at our sales pipeline. We concluded that the [Sales] pipeline does not support the prior revenue guidance.**" [Emphasis added.]

56.    Paul Berger, when questioned about the problems the Company had had about penetrating the "final" reads market, and how that differed from the Company's entry into preliminary reads business, Paul Berger replied:

Yes, *it is absolutely day and night, another really good question.*

Succinctly, the nighttime market, *the emergency Preliminary market itself was picking low-hanging fruit.* The doctors ultimately needed a way to change what they were doing. It was very difficult to work their ridiculous hours and be called several times during the night, and then work the next day. So, picking the low-hanging fruit was something that was very easy to accomplish.

When we talk about – some of the Preliminary type work that we do will transition to Finals type work on an emergency basis because some doctors don't want to read it or don't have the staff or, from an economic perspective, they would prefer it to be done on a Finals basis.

In our world today – and it's a very small percentage of our overall workload. It's probably 5% or 10% and it makes up about 30% of the Finals work that we do.

*The big ticket that I think the investment public focuses their attention on, or should focus their attention on, or what we talk about at least, is the $15 billion Finals market, a lot of which is daytime. And the question that needs to be asked, I think, is why would the radiologist who are doing this throughout the country and making $15 billion from it turn over some of their bread and butter to folks like us?*

*And that requires a number of things. It requires a paradigm shift* to understand that in the long run, we will solve all of their staffing solutions forever. And we can offer subspecialty services. We can offer the ability for them to get cardiac services. We can offer to do the billing and revenue cycle management for them. We can offer a whole host array of services.

[Emphasis added.]

57.    On this call, Paul Berger also revealed the long-existing gaps in coverage, and the bonuses the Company had been paying the radiologists from the acquired companies that had devastated its margins:

*With the size and complexity of the coverage and the relatively short lead times with respect to our previous scheduling process, we had difficulty meeting the demands at appropriate times.*

We were scheduling our doctors too late in the process. They had a great deal of flexibility, still do. But, as a result of that, **we had to pay significant additional compensation to meet the customer demands.**

In a given weekend, for example, we might not have had enough radiologists scheduled. And they're independent contractors, and our scheduling process was such that the lead times to schedule them was not what it should be.

*Again, those were very costly things, and we wanted to make sure that customer service was satisfied, so we had to pay higher premiums to get those physicians to be there at the times that they didn't expect to be there.*

[Emphasis added.]

58.    With this call, Paul Berger finally admitted that the corporate acquisitions that he and his son had engineered were stunning failures, and that he had, in fact, merely been talking *"a pretty good game,"* in misleading investors. In Paul Berger's own words, in announcing a much more realistic guidance for 2008, he had *"just stopped drinking the Kool-aid."*

59.    That the trend in customer losses had long existed was confirmed in NightHawk's Quarterly Report (Form 10-Q) for the quarter ended June 30, 2008:

**Trends in our Business and Results of Operations**

*Revenue Trends.* The market for off-hour, emergent, preliminary reads has historically experienced rapid volume growth. Our growth has been driven by an increase in our customer base, an increase in utilization of our services by our customers, acquisitions, an expansion of services offered, an expansion of our service hours, a high customer retention rate and the growth in the use of diagnostic imaging technologies and procedures in the healthcare industry. In recent quarters, such growth has moderated as the market has matured. *In addition, the market has attracted increased competition over the past several years. These factors have resulted in a slowing of market volume growth and*

*declines in average prices.* As a result, our revenue growth has moderated from historical levels.

While we expect our strategy for future growth to be successful, *we have experienced, and expect to continue to experience, an impact on volumes resulting from the loss of certain customers. Finally, we also expect the pricing pressures to continue in the future*.

[Emphasis added.]

60.     At its July 30, 2008 earnings conference call on the 2Q08 results, Murnane further elaborated upon the Company's historical problems:

The second area of improvement focuses on service levels and customer satisfaction. As I outlined in our last call, *in the latter part of 2007 and early 2008, we experienced service difficulties primarily related to physician scheduling. These difficulties manifest themselves in longer turnaround times and schedule gaps and these service problems did result in some customer loss.*

*Put simply, service problems for some of our customers opened the door to competitors' offers of lower prices and some customers accepted those offers. In addition, some customers who came to NightHawk through acquisition and had very low historical pricing chose not to renew when they were offered higher renewal prices. In particular, this occurred with some acquired Radlinx customers where many of them had very low priced, low margin finals contracts.* While *our volumes reflect the loss of these contracts*, our average pricing and related margins actually improved due to this loss of low priced business.

\*        \*        \*

*An additional benefit of our scheduling improvements has been the reduction in physician on call pay.* In the second quarter, we reduced these costs 80%. This is a direct result of a combination of actively managing the scheduling system and process combined with the cooperation and flexibility of our physicians in meeting our scheduling requirements.

*So, by removing the scheduling inefficiencies, we have been able to quickly improve service to our customers while reducing the cost of delivery.*

[Emphasis added.]

61.     During the same call, Murnane confirmed that the declines in customer service dated back to the Radlinx acquisition: "*We didn't extend some of the contracts to doctors just after the acquisition that were covering those sites so the service was impaired to some degree.*" [Emphasis added.]

62.     NightHawk's customer attrition problem that the Company had experienced was also discussed by David Engert, who replaced Paul Berger as CEO in November 2008. During NightHawk's fourth quarter 2008 ("4Q08") earnings conference call held on February 18, 2009, Engert, in commenting upon his review of the business since taking over as CEO, stated, "We have *suffered excessive customer attrition over the past 18 months* and this is unacceptable going forward." [Emphasis added.]

92. On May 1, 2009 the Company wrote off the entirety of the over $60 million in "good will" recorded in connection with its three corporate acquisitions.

### F.     Insider Trading

63.     At the time NightHawk went public in February 2006, Defendant Paul Berger held 7,326,921 shares of the Company's.   From August 22, 2006 through November 27, 2007, Defendant Paul Berger sold 1,948,715 shares of NightHawk stock for proceeds of $36,784,650.07.   At the time NightHawk went public, Defendant Jon Berger held 2,390,630 shares. From August 15, 2006 through November 1, 2007, Defendant Jon Berger sold 846,750 shares of NightHawk stock for proceeds of $15,916,957.36.  These stock sales occurred during a time when they had knowledge of the actual conditions of the Company that were being concealed from the public.

## V.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.    Plaintiff brings this action derivatively in the right and for the benefit of NightHawk to redress the breaches of fiduciary duty and other violations of law by Individual Defendants.

65.    Plaintiff will adequately and fairly represent the interests of NightHawk and its shareholders in enforcing and prosecuting their rights.

66.    At the time that this action is initiated, the Board consisted of the following five (5) directors: defendants Bland, Brophy and Chung, and non-defendants David M. Engert and Jeff Terrill.  Plaintiff has not made any demand on the  Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

    a. During the Relevant Period, defendants/directors Bland and Brophy served as members of the Audit Committee.  Bland was the Chair of the Audit Committee and was determined to be a financial expert. Defendants/directors Bland and Brophy are interested because they face a substantial likelihood of liability for their systematic failure to properly exercise their fiduciary duties as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are charged with, *inter alia*, overseeing the Company's compliance with legal and regulatory requirements.  Defendants/directors Bland and Brophy breached their fiduciary duties of due care, loyalty, and good faith to the Company and its stockholders because the Audit Committee caused or allowed false and misleading statements to be disseminated in the Company's SEC filings,

press releases, and other public representations, and failed to ensure that the Company had in place a system of adequate internal controls. Therefore, demand was not required upon defendants/directors Bland and Brophy.

b. The principal professional occupation of director Engert is his employment with NightHawk as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Thus, director Engert lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

c. Defendant/director Peter Chung has been a member of the Board of Directors of Sirenza Microdevices, Inc. since October 2001. Defendant/director Bland served as CFO of Sirenza Microdevices, Inc. from July 2005 to November 2007, and as its COO from May 2003 to July 2005.  As a result of this longstanding and entangling professional and personal relationship, Defendants/directors Bland and Chung do not possess the independence needed to make a disinterested decision on whether to pursue the derivative claims; thus demand is excused.

d. Defendant/director Peter Chung the managing director/partner of Summit Partners, a private equity and venture capital firm.  He is also a member of various entities affiliated with Summit Partners.  On April 7, 2004, NightHawk announced that it received a $25 million private equity investment from Summit Partners in 2004.  In return for this investment,

Defendant/director Chung received a seat on NightHawk's Board of Directors. As a result of this longstanding and entangling professional relationship, Defendant/director Chung does not possess the independence needed to make a disinterested decision on whether to pursue the derivative claims; thus demand is excused.

e. As noted earlier, NightHawk's highly touted TALON system was developed by Paul Berger's son, Scott Berger (who served as the Vice President of Product Development); however, the software did not work and eventually led to NightHawk's material breach of agreement with Midwest/St. Paul and the unwinding of the Midwest/St. Paul transaction at a significant loss to NightHawk. Despite this, upon information and belief, Scott Berger has not been terminated, and no action has been initiated to recoup the losses to the Company.

67.   Plaintiff has not made any demand on the shareholders of NightHawk to institute this action since demand would be a futile and useless act for the following reasons:

a.   NightHawk is a publicly held company with approximately 71 million shares outstanding, and thousands of shareholders;

b    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

**FOR DISSEMINATING FALSE AND MISLEADING STATEMENTS**

68.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

69.   As alleged in detail herein, each of the Individual Defendants had a duty to ensure that NightHawk disseminated accurate, truthful and complete information to its shareholders.

70.   Individual Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to NightHawk shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

71.   As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

### COUNT II
### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN ADEQUATE INTERNAL CONTROLS

72.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.   As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's statements were accurate and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

28

74.     Individual Defendants willfully ignored the obvious and pervasive problems with NightHawk's reporting practices, procedures, and internal controls, and failed to make a good faith effort to correct these problems or prevent their recurrence.

75.     As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

76.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.     By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of NightHawk.

78.     Plaintiff, as a shareholder and representative of NightHawk, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
## AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence NightHawk, for which they are legally responsible. In particular, Individual Defendants abused their positions of authority by causing or

29

allowing NightHawk to misrepresent material facts regarding its business practices and prospects.

81.     As a direct and proximate result of Individual Defendants' abuse of control, NightHawk has sustained significant damages.

82.     As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

83.     Plaintiff, on behalf of NightHawk, has no adequate remedy at law.

**COUNT V**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     Individual Defendants had a duty to NightHawk and its shareholders to prudently supervise, manage and control the operations, business and disclosure controls of NightHawk.

86.     Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of NightHawk in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Individual Defendants breached their duties of due care, diligence and candor in the management and administration of NightHawk's affairs and in the use and preservation of NightHawk's assets.

87.     During the course of the discharge of their duties, Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Individual Defendants caused NightHawk to engage in the scheme

30

complained of herein which they knew had an unreasonable risk of damage to NightHawk, thus breaching their duties to the Company.   As a result, Individual Defendants grossly mismanaged NightHawk.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Declaring that the directors of the Company have violated and/or aided and abetted in the breach of their fiduciary duties to the Company and its shareholders;

C.   Removing and replacing the Company's directors, instituting a new election of directors and appointing a receiver for the management of the Company until a new election of directors is called and determined;

D.   Ordering appropriate equitable relief to remedy Individual Defendants' misconduct;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: September 2, 2010

FEDERMAN & SHERWOOD
William B. Federman (OK #2853)
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

Marc S. Henzel, Esq.,
Law Offices of Marc Henzel
273 Montgomery Ave., Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

Kenneth L. Pedersen (ISB #1436)
klpedersen@pedersen-law.com
Jarom A. Whitehead (ISB #6656)
jwhitehead@pedersen-law.com
PEDERSEN and WHITEHEAD
161 5th Ave. S., Ste. 301
P. O. Box 2349
Twin Falls, ID 83303-2349
Telephone: (208) 734-2552
Facsimile: (208) 734-2772

Counsel for Plaintiff

## VERIFICATION

I, (ANJAY ISRAN) declare that I have reviewed the Complaint ("Complaint") prepared on behalf of NightHawk Radiology Holdings, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of NightHawk Radiology Holdings, Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring

8/31/10
Date

(Signature of Investor)